Good morning, Your Honor. May it please the Court, my name is Douglas Passon and I represent the defendant, Appellant Scott Segal in the case. With the Court's permission, I'd like to argue the issues in the brief for 15 minutes and reserve 5 minutes for rebuttal. The first issue is the Court's claim that the District Court erred when it denied the Appellant's motion to suppress. So let's focus on two issues. Under the circumstances in this case, the consent that Mr. Segal and his mother gave to search the storage facility in Arizona was not voluntary. And two, the facts of this case fall squarely within the Court's recent decision in United States v. Scott. So let's talk about the voluntariness of the consent. Here's what we know. The defendant was in jail at the time consent was given. He was trying to get out of jail. It was at a detention hearing in the District Court in the District of Massachusetts. Here's also what we know. His release was conditioned upon the consent to search the Arizona storage facility. You skipped a step. Yes. Didn't you skip a step? Nobody knew the things were in Arizona. His lawyer said. Isn't that a step? His lawyer said, we will do thus and so. Isn't that what we see when we look at the record? It is true, Your Honor, that neither the government nor the Court were the ones that expressly put forth that option. However, that does not end the inquiry, and here's why. What happened here. Makes your case better if it's not an inquiry, maybe. That's your view. But here's what the record really shows, Your Honor. And what the record really shows is that the defendant, through counsel, acquiesced to the only solution that it knew would satisfy the Court and the government. But on this record, we don't know whether that's true or not, because we don't know what would have happened had he not, had his lawyer not proposed to give the information. Isn't that the status of the record before us? Respectfully, no, Your Honor. All right. That's why. What we have here is a situation. Don't worry about disrespect. I haven't seen it in a long time. Here's why, Your Honor. First of all, the government starts the ball rolling. They're the ones that have the ability to ask for detention. They ask for it. Their request for detention was based primarily on the fact that the storage locker in Arizona existed. Counsel for the defendant knew he had to address that, so he took steps to address that short of the final proposed solution, which was surrender to the government. If we look at that. What a reasonable conclusion he is. He assumed they wouldn't break open the boxes, but they did. Well. Don't you think that's a reasonable conclusion? I think that, I think maybe that's getting ahead of, ahead of ourselves. But what I want to make clear for the record is that defense counsel only proposes after proposing a series of other less intrusive means. For example, the record is very clear that he asked for the judge to impose very strict terms and conditions that the appellant not possess or be near firearms, thinking, well, that solves the problem. He can't be near firearms. Therefore, he can't be near the firearms in Arizona. Then he proposed a very strict condition that the defendant appellant not leave the Commonwealth of Massachusetts. Presumably thinking, well, that would address the problem because the guns we're talking about are in Arizona, and if he can't go there, problem solved. And finally, he proposed an order that the appellant should have nothing to do with and will not go near any gun-related paraphernalia or the cache of weapons in Arizona. So what we see here is the defendant, through counsel, tried to ameliorate the problem that was formed by the government. And none of those solutions satisfied the Court, because we see from the record the Court went on and pressed about the issue concerning the Arizona storage facility. So what do we have to decide when we look at this record so far as you're concerned? What is the narrow issue before us? I think there's two issues, Your Honor. The first is the voluntariness of the consent, and this is an issue that was not put on the table in the Scott decision. But it's an important one here, because the defendant was faced with a Hobson's choice of either giving this up to the government or staying in jail. Well, do we know that from this record? We don't. I think we can very clearly infer that from this record, Your Honor. What should the district court have done? The district court – well, the district court found that consent was voluntary based on the fact that counsel proposed this and that the defendant had counsel there. And so one of our arguments is that finding was clearly erroneous. The issue – But when was that? That was in a pretrial motions hearing concerning the suppression issue in this matter. The issue – What should – who entered the order for release? The magistrate? The magistrate of the district court. What should the magistrate should have done? The magistrate – what should the magistrate should have done? Well, the magistrate shouldn't have compelled Mrs. Siegel to consent to a search of the locker. The magistrate – If counsel says we'll consent to the – if the counsel wants him out, says we'll consent to the search of the locker, what should the magistrate have done? Say that's not voluntary? Somebody should have stood up to protect the defendant's rights in that – in that instance, Your Honor. Because this – this – Well, Your Honor, I – I mean, maybe – I'm – you know, I'm – maybe you've got some kind of ineffectiveness claim down the road, but I don't – I don't – I can't see what the magistrate should have done here that was different. I'm not sure if we have ineffectiveness or not, because any lawyer who's ever defended a client in a detention hearing knows that – They want to get him out. They want to get him out. Yeah. And this is what recognizes the importance of power in that situation, because the defendant's going to basically concede to anything in order to be able to sleep in his own bed that night. Nothing in this record shows that, does it? He was confined. He talks about his mother being elderly, and he wanted to be with her, and he would do anything to get out so he could be with her, but there's nothing in the record that shows that either. Well, I think the record does show that. I think the government actually conceded in its argument to the magistrate that there was evidence that he lived at home with his mother, that his mother was elderly – In her seventies. And relied on the defendant for care. That's right. Oh, no, I don't think that's – maybe I missed it. And relied on the defendant for care? Is that – are you saying that's in this record? I believe it is, Your Honor. I believe it is. I wish you'd checked. But I may be mistaken. I think you're mistaken. Because these issues came up throughout the course of the proceedings. What's there is that she was past 70. And that she lived alone. And he lived together. She lived alone with the defendant. So if the issue regarding care wasn't explicit, I think it was implicit in the record, because in the very instant that the counsel appeared for the defendant in the initial appearance, he brought this issue to the table. And he nearly begged the court to have a detention hearing that very day, because the defendant needed to be out and raise the issues with his mother in the very first proceeding. Now, so there's this imbalance of power, Your Honor. Then we get to the second problem here. And it's a problem that the Scott case raised. And that is that a defendant cannot, well, let's talk about Scott. Police cannot conduct a search of a pretrial releasee based on something less than probable cause, absent special needs that extend beyond the normal need for law enforcement. So this adds an extra problem to the search. The government would have this court find that Scott was somehow limited to these blanket waivers, drug testing requirements, or blanket search waivers. But there's nothing in Scott that touches on, that limits the holding of Scott. What we're talking about is the unconstitutional conditions doctrine. And what happened here is that regardless of who brought it up, there is no dispute that the court conditioned release upon consent to search, which is therefore an unconstitutional condition of release that can only survive scrutiny if there was probable cause for the search. Have you got a case that shows when counsel for the defendant proposes the grounds which are accepted by the court, there's an error? I have not found such a case, Your Honor. And if we hold that, this would be the first time it's ever been held, wouldn't it? So in essence, what you're asking for is that counsel can say, we'll consent to this kind of search, we'll consent to any kind of random drug search. Why don't you impose this condition in order to get the client released? And then when that turns out to yield, when that search that was counsel's idea turns out to yield inculpatory evidence to say it was not consensual and it was coerced, is that the scenario here? The scenario is, you know, I'm not sure that the lawyer at the time contemplated that, but this is a different lawyer and this is a different issue that came up. I don't believe that the lawyer in Massachusetts ever foresaw what would result as a result of this release condition. And he might have relied upon what his client told him, what somebody would find when they searched, and then they found more. Well, and then we have the other issue, and that is the judge's order wasn't for a search. It was that, and I'll try to quote as closely as I can, that basically the government just hold these items until the conclusion of the case. And so these parties did not contemplate the extent of the search and the multiple layers of search that would occur. So when we talk about voluntariness of consent, you know, we have to look at what the state of the mind of the parties are and what they could have envisioned happening here. But going back to the probable cause issue, I think Scott is very clear. And, Scott, there is no dispute that the release was conditioned on the search. And, therefore, we have to look at the issue of probable cause. And here there was no probable cause. Now, the government claims there's probable cause, but I'm still not clear to this day what the government is saying there was probable cause of, what exact crime they were referring to. The government has not articulated an actual crime there was a probable cause for at the time of the search. Now, there is nothing remotely resembling probable cause that the defendant was engaged in any criminal activity in Arizona. There was no evidence that the defendant ever committed any violent crime involving weapons. That much was conceded by the government at the detention hearing. The evidence presented to the magistrate simply showed that the defendant freely admitted to relinquishing this collection sometime in the past. That's not evidence of a crime. If anything, that's evidence of the defendant's willingness to comply with the laws by dispossessing himself of this collection. And there was absolutely no evidence that at the time of the search occurred that the defendant possessed these weapons. And when I say possession, I mean we have to look at the definition under the Ninth Circuit model jury instructions, and that is exercising dominion or control. More specifically, in a constructive possession case, you have to show the intent to possess the items combined with the ability to do so. Whose storage facility? Who rented the storage facility? His mother? His mother. In the trial, it came up that initially the storage facility was placed in the defendant's name. However, that was a mistake that was corrected to show that his mother was going to be in charge. And both he and his mother consented to the search? Yes. Yes, Your Honor. Well, let me back up. In the court proceeding, the magistrate, probably recognizing that there was no evidence that the defendant had any dominion or control over this locker, didn't actually ask the defendant to consent to the search. We look at his order, which is part of the record, and it simply says that his mother, Miriam Ruth Siegel, has to consent to the search. So her consent, she didn't make that proposal. Her consent was certainly not voluntary in the case. Later on, after the defendant was released, I believe, the government drafted a stipulation wherein the defendant signed and gave consent to search the locker. Okay. You know, I don't want to take you on a tangent, but that's one thing that you know the record shows. The mother was living in where? Massachusetts at the time. No, I thought she was living in the place where they were living together in Massachusetts. Correct. They had previously lived in Arizona. Yes. Yes. Yes. Yes. Yes. Yes. What I was saying, there is no probable cause to believe that he was committing a crime. Any evidence supporting probable cause that the defendant possessed those weapons or had dominion or control over the storage facility was found as a result of the search. That's how the government ended up making his case for possession and bringing the charges in Arizona. There's certainly no other special needs that would justify the search. The government knows that, and that's why it's now time to make a case for probable cause under Scott, and he can't do it, and therefore the search must fail. Okay. You do. You have five. Close to it. Okay. Thank you. Thank you. May it please the Court. My name is Fred Batista. I'm with the U.S. Attorney's Office in Phoenix, Arizona. With respect to the issue of a voluntary search in this case, I think the government and the defendant are looking at the same set of facts, but we come to different conclusions from the facts. First of all, the mother gave consent. She was not charged. The mother's consent is not an issue in this case. The defendant focuses on the fact that at the time that he offered up the weapons, he was in custody. But we have to look at all the other safeguards that were in place at the time that this issue arose. He'd been indicted. He'd been arrested pursuant to a warrant. He'd received Miranda warnings three times. He was represented by counsel. And he was in the middle of a detention hearing when the defendant offered up this condition. The defendant poses the facts. The defendant's view is that the court and the government demanded that the guns be turned over to the government. There was no demand. The magistrate judge expressed a concern. All right, we've got a defendant. We're looking at his history. We know, you know, he has a past conviction for involving silencers. He's charged with possessing a machine gun. He's a felon. And now the possibility he has access to 50 guns in Arizona. His mother, supposedly his mother is the one that has control of these weapons, but he lives with his mother. His mother's in her 70s. She's elderly. So who really controls these weapons? The magistrate judge says, I have a concern with the defendant's access. And then it's the defense counsel who then proffers to the court, we'll turn the guns over to the government. And the question is what went on between the defense counsel and the defendant? And I would posit to the court, Your Honor, that basically the defendant lied to his counsel and didn't fully disclose what had happened. Because I think if the defendant had said, well, I'll tell you what happened. After H.F. found out that I had a machine gun, I boxed up 110 guns, 30,000 rounds of ammunition, 80 pieces of explosive materials, disassembled bazookas and flamethrowers. I put them all in a truck and I shipped them to Arizona and I locked them. And I was the one that hired the storage facility. The defendant says, well, it was in his mother's name. But what happens is the defendant calls the facility, he sets it up, and then after to kind of cover his tracks, the defendant's girlfriend, who's the manager of the facility, then adds mom's name to the contract. So I'm sure that if the defendant disclosed all that information to his defense counsel, I don't think his defense counsel would have jumped up in federal court in Massachusetts and said, oh, we'll turn this over to you. I think the position of the parties in Massachusetts were, in theory, there were 50 guns in the storage locker that the mother was holding for the son. And that was a concern. So it was a reasonable condition by the magistrate to say we need to limit access, the defendant's access to these guns. The defendant had additional options. He could have posited that the guns be put in possession of a more trustworthy third party. I mean, there are obvious that this has been done in the District of Arizona on a regular basis. The government was not asking that the government receive the guns. The government was just concerned about the defendant's access to the guns. An additional point which the government notes in its brief, the defendant has no standing in this particular case because he took the position that he had divested himself of these guns. The guns were in the possession of his mother. So, therefore, if he has no standing, he shouldn't even really be able to raise this claim. You know, Your Honor, we understand, we have to understand why he makes all the arguments he can make, because this is an extremely harsh sentence. And what he, his felony was possession of a silencer. And then this complicated it when they opened and found what they found. And I don't know, but they were pretty, the boxes were pretty secure until the government broke in to them. They didn't just throw the boxes out. They opened the boxes. And I suspect somebody didn't think they were going to open them. Well, there is that possibility. There's nothing to preclude them from opening them, I don't think, on this record. That's what happened. I think, and when we look at the government, I think the government has a duty. I mean, you go to a facility and there's two huge shipping crates. The crates are approximately the size of this table and the podium here. We've got two crates that size in a big safe. What are they taking into their possession? What are they going to do with it? Is there, what type of hazard do we have here? And I think it's clearly reasonable for the government, particularly in this particular case, in light of what they found, they had to inventory what they were taking into their possession. And one of the first things they had to do as soon as they found the explosives, oh, now everybody has to back off. Now we've got to get the bomb team in here. We've got to deal with it. There were a lot of issues that were generated in light of the defendant's nondisclosure of what was really going on here. Could you address the probable cause issue? Probable cause? Yeah. Is there probable cause here or independent of the case? Well, first of all, I don't really think probable cause is necessary because the defendant is consenting. Yeah. I'm asking you as opposed to we were. I'm just asking you. Let's look. What are the facts? We have a defendant who has a prior conviction for possession of an unregistered silencer in the early 90s. ATF finds out that subsequently, approximately 10 years later, he's had a machine gun illegally for over 10 years that he knew he should have turned in or given up, and he never did that. While he's a felon, he's also buying machine gun parts. When they show up to his house, he's extremely nervous when he abandons the machine gun and the machine gun kit. And what's one of the first questions he asks? Am I going to jail? The agents are standing outside of his house in Massachusetts, and they've got a machine gun in their hands. And they ask him, could we just step inside? You know, since, I mean, the defendant literally hands them a machine gun on the front porch of their house. And they say, can we step inside so we don't have to stand out here in this residential neighborhood with the machine gun? And the defendant's like, no, you can't come in. So then they subsequently search the house after he's arrested on the charges in Massachusetts, and what do they find? They find all kinds of gun parts and bullet parts, including 50 caliber projectiles. So now we have this defendant who, once he's convicted, he continues to possess guns, he's acquiring a new gun, and he's got all these parts. And there was the testimony and the experience of the agent. He had never seen someone possessing all these different parts, the stocks, the scopes, and the pictures were offered. So the guns, additional guns had to be somewhere. And it was the defendant who said, hey, I've got, my mom's got 50 guns for me in Arizona. So that's where they were. But there was no independent evidence other than his, was there anything that linked that? Well. Was there any evidence that he had, that there was a storage facility in Arizona? No, Your Honor. But the search wasn't, it wasn't conducted until the defendant's attorney got up in court and said, Your Honor, the guns are in Arizona and here's the address and, you know, his mom's holding them for him. So what more probable cause do you need when a defendant on the record in open court pursuant to counsel says the guns are here? And I think the issue with. And that was, that was, just help me again. So he might not have been released as being a danger because the, because they thought the weapons were in Massachusetts? Well, no. They believed the weapons were in Arizona. The concern was here we have a defendant who has got a prior felony conviction and he's showing a continuous disrespect for the law. Even though he's convicted of a felony, he knows he shouldn't have guns. That came out. He had a probation officer. Originally when he was convicted, he divested himself of all of his guns. And then after he was off supervised release, all the guns came home. So he knew he shouldn't have guns. And yet what does he do? He continues to possess his baby, a machine gun that he's had since he was 21 years old. He never gives it up. And then he's buying at least one new machine gun kit. And he's extremely nervous about going to jail. So the government has a concern. When you look at this guy, look at his total package. This is a guy that doesn't get it. He's not supposed to have guns. He's continuing to have guns. He's got access to possibly 50 more guns in Arizona. My question, did they know he had guns someplace? That's all I'm asking. Yes. When he was arrested, then this came out at trial. What happened was when the search was conducted of his house and all the stocks and the scopes and the bullets were found, the agents were curious, well, where's all the other stuff? And when the defendant, after he was Mirandized, when the defendant was going in on his arrest in Massachusetts, they asked him, so where are all the guns? Do you have a storage locker? Yeah, there's a storage locker in Arizona. I gave my mom about 50 guns, including assault weapons. They asked him, where is it? And he's like, well, he wouldn't tell them. He just said it was in the Phoenix area. So that's basically what the government knew. And there wasn't any search. The search doesn't even start until after we have the court proceedings where the defendant, through counsel, confirms where the guns are. I think the other issue that the government would like to address is the issue of inevitable discovery in the scope of the consent. Clearly, the original consent was for the weapons to be merely stored until the end of the case in Massachusetts. But when we look at the situation here, it's reasonable to assume that the government would have to secure these items, would have to inspect them, would have to document them to be able to justify in order to show, well, this is what we took into evidence, or this is what we took into our possession on day one. So on day 20 or 100 or 1,000, they would be able to say these are the same items. And I think it would be inevitable in this particular case that once the government started to categorize these items, they would have to, there would be an additional and further investigation. The defendant argues that inevitable discovery doesn't apply, but I believe if this Court finds that the consent is voluntary and the government had lawful access to the weapons, then, therefore, it would be inevitable that once they looked at the weapons, there would be further investigation on behalf of the government. The defendant raises another issue. But does the Court have any questions on the other issue with respect to the Brady violation? Judge, I apologize. I have not made any eye contact with you. Thank you. Are there any further questions of the government? I don't appear to be in. Thank you.  The government stated that the issue regarding her mother's consent because she was never charged, her consent is not an issue in the case. But I think that bears mentioning that her consent is very much an issue in the case. We didn't really go into this in the pleadings because the government didn't raise it. But the bottom line is the consent was ordered by the judge. There's nothing on the record that Miriam Ruth Siegel had anything to do with the decision to consent to the search. This was nothing that she proposed to the judge at the hearing. It was something the judge ordered her to do. And he did so presumably on the record that the guns didn't have anything to do with Mr. Siegel. They were in her possession. And so I look very briefly to see if there were cases that involved involuntary consent from a third party. In other words, it's something like that. She signed the consent form, didn't she? She signed the consent form, correct. But that was only after the judge ordered her to give consent. And it was only after she was under the understanding of that. You've got a better argument than that, I hope. You know what the problem is with that argument. She wasn't before the court. You'd say the court ordered her.  The court, the son, her son was before the court. And whether it's a, she's a mother and her son wants out, she may sign and do it. And you can argue, I suppose, that that means she's coerced. But the court couldn't order her to do anything at that point. The court did order her. And it's set forth. No, but if she'd gone to a lawyer and said the court has told me to do this, and the lawyer would have said to her very quickly, well, you weren't before the court. You aren't a part of this. And I submit that this happens with common citizens every day when the government exceeds the scope of their authority. And they don't know that they don't have the ability to say no. When a judge says do something, you do it. What we look at is this record. And what do we see when we look at the record? Do we see defects in the consent so far as you're concerned? I'm sorry. Defects in the consent. Defects in the consent and assertiveness. Where is the defect? The defect is that there were that, first of all, the court is focused on the fact that the defendant proposed this solution. I submit that the record does not state that. The record does show that this was the defendant's idea, but the circumstances show that it was the only idea that the defendant knew was going to satisfy the government and the court. With due respect to the government, I think it's a disingenuous argument to say that they could have proposed some other alternative, like putting these weapons in the hands of somebody else besides the mother, and the government or the court would have said, that sounds like a fine idea. No. And I made this analogy in my brief. It's the same as when a court asks a defendant to surrender their passport. They're doing that to guarantee under no circumstances will that person flee the country. They don't say give your passport to a trusted family member or put it in a safe deposit box. They say you give it to the court. That's the only way to guarantee. And I think reasonable minds know where the government was going with their request for detention and where the judge was going when he refused all other options proposed by defense counsel. Back to the consent issue, the judge ordered mother to consent, and I looked at some cases, and there is a defense third parties cannot be coerced to consent, even if they're not charged or before the court. The government also talks about the standing issue. And it's interesting because it really wasn't raised in the government's pleadings, aside from maybe a short footnote on that. And I suspect the reason why is because the government's whole criminal case in the District of Arizona is based upon standing. The government wants to have its cake and eat it, too, by saying, well, these aren't the defendant's guns, so he doesn't have standing. Well, if that's the case, then why was he charged with possession of the weapons in Arizona? Now, even if we assume that my client's version of events were true and that he had completely dispossessed himself of the collection, which of course the jury didn't agree with, but even if we assume that the defendant still had standing, because I submit a defendant can still have a reasonable expectation of privacy in items that he doesn't possess at the time it is a crime. Okay. In the District of Arizona. That's all I have. Thank you, Your Honors. I submit. Thank you. Are there any further questions? There don't appear to be any. Thank you, counsel. The case just argued is submitted for decision.
judges: Schroeder, Farris, Rawlinson